Good afternoon, Your Honors. Kent Russell, the attorney for the petitioner. Before I get started, I'd like to mention that there are a number of family members who've come out from some distance to be here at the argument. They're all seated in the front row here. This case has been briefed extensively, and I know you're familiar with the briefs. I thought that I would use my time here today to highlight what I think are some very unusual aspects of this case. I know that you get a lot of so-called IAC or ineffective assistance cases on habeas, and I think there are some factors that make this case really unusual, if not unique. The first is that we've got a defendant who was 19 years old at the time of the offenses with no prior felonies and who's been sentenced to life without parole. Secondly, we have only one issue in the case because the shooting was admitted, and so the only issue that's a live issue at trial is whether there was the intent to kill that's required for first-degree murder and for the special circumstance. Thirdly, which I find very unusual, is that rather than the record demonstrating a tactical or strategic reason for counsel to have failed to call an expert, you have the opposite here. You have the record showing that counsel actually moved to continue the case for the express purpose of getting time to develop expert testimony, the opposite of a tactical decision. Help me on this. We do a lot of cases, and I could be misremembering the facts or mixing up your case with another. I thought what happened was counsel did consult an expert. He got a report from a psychologist, and then he was deciding what to do with it and whether to put it on, and he mentioned to the judge that it was a double-edged sword, which suggested that it was a considered judgment about which the better tactic was because the psychologist's report had some really harmful things in it. That's not what's in the record. I suppose you could speculate about that, but here's what's in the record. I thought what was in the record was the double-edged sword. No, no, no, no. The only reason that counsel gives for the counsel wants this continuance. He's got this report in his hands, and he wants a continuance for two purposes. Number one, he wants to work more with whatever he's got in this report, but primarily he wants to go out and get another expert to deal with the methamphetamine psychosis issue, which the expert report that he had in hand didn't address because this was a good. I remember when I did criminal defense, sometimes the clients would say, well, the reason I did it is I was drunk or I was high, and I would think, gee, the jury's just going to hate you worse. Well, you've got this instruction now. It's Calgic 3.32. We cite it in the briefs. And it's a very specific instruction that says that you can introduce evidence of a mental disorder or defect for the express purpose of negating intent. And what's interesting about that instruction is that you can't get it without expert testimony. The cases are quite clear. Kennedy, you're not supposed to consume methamphetamine in the first place. So saying you're out of your mind because you were doped up with methamphetamine, why is that good? Well, it's not a voluntary – granted, it's voluntary intoxication, and he's responsible for having taken the methamphetamine, but we're not talking about a case where his contention is, look, I was too high to know what I was doing at the time. The contention by the expert would have been that he had a chronic methamphetamine psychosis that started long before this event. He happened to be binging at the time, yes, but he had a methamphetamine psychosis, which is a recognized diagnosis in the DSM. It's an Axis I diagnosis. And that's all they had to work with here, and that was the reason for moving to continue. Well, why wasn't the error the denial of motion to continue rather than an effective assistance of counsel? Because it was counsel's fault for waiting until the 11th hour to move to continue. The judge had very good reasons for denying this motion. The motion was made four days before the start of trial in a case where counsel was the counsel at the preliminary hearing and had done nothing for the 9 or 10 months between the preliminary hearing and when he finally got around to making this motion four days before trial. So the judge was right. You know, he waited too long to bring this motion. Now, what that did, effectively, was it put counsel under the gun because he now had to scurry around and get, you know, these reports without the motion to continue granted. And the record shows he simply didn't do it. In fact, he says, I'm going to go out and get this report from this Dr. Siegel. But as you'll see from the record, when I asked him for that, he never got it. So the record, whatever the record shows, is that it's the counsel, rather than having a strategic reason here, it's the opposite. He strategically moved to continue to get expert testimony that he never got. It's a problem saying, well, you ought to get expert testimony. So you get expert testimony, and the expert just sinks your case. And so you say, give me more time. I want to keep shopping for experts until I get a good one. But no expert sunk his case. That's the point. The only expert that he got said that he firmly concluded that he lacked the intent to kill. That was the only expert opinion. The only expert's opinions in this case are that he lacked the intent to kill. This isn't like those cases where they go out and they get two expert opinions that are lousy, you know, and then we want them to shop around and get a third or a fourth. Kennedy. But that's not admissible. I'm sorry? You're saying he had an expert saying that he didn't have the intent to kill, but that's not admissible. Bottom line, right, it's not admissible. But as Calgic 332 shows, you have to have expert testimony to support that instruction. And so what the expert does is he comes in with all the historical factors. This report was, you know, 30 pages long, 29 pages of which were historical factors and findings that would have supported the jury deciding that he had a mental disease or defect. If he had Dr. Howells, if Dr. Howells had testified, he could have testified to all of that? Right. The only thing he couldn't testify to was the methamphetamine. So you've got to have Dr. Howells. So the counsel was ineffective because he failed to call Howells as a witness at the trial. Is that your argument? Well, I'm not saying that it had to be Howells, okay? The other side is setting up this idea that there was a lot of damaging information in the Howells report. I disagree with that. If you look at what they call as damaging, they're saying that, well, you know, he was faking bad, but meaning he was exaggerating. But is the ineffective assistance then the failure to move earlier for the continuance? Yes, sir. And to get a methamphetamine expert to testify to methamphetamine psychosis. Now, he could have also used Dr. Howells to supply some additional historical findings that would have helped that expert in rendering an opinion, the very same opinions that I've presented to you on habeas through Dr. Benson. But the ineffectiveness was in not doing what Howells wanted him to do, which was get a methamphetamine psychosis expert to come in here and testify. And so we don't have any rebuttal experts. And so the only opinions we have are the Benson opinion, which is certainly enough, I would think, to establish a prima facie case. You have the Howells opinion, the bottom line of which is supportive, and there's some stuff in there we could talk about and go back and forth. I've done that extensively. Kennedy, how do you put in the good stuff without the bad stuff from the Howells opinion? I thought the Howells opinion was pretty bad, actually, when I read it. Well, it isn't so bad. I mean, the thing is that there are three things that say it's bad about it. First of all... Well, let's look at it directly. I mean, I don't care what they say while I'm talking to you. And I just want to know what you say. Okay. Well, here's what I say. Number one, that the only thing that... My star is on page 89 of the excerpts, incidentally, where he basically thinks that your client was lying to him and also 88. Yeah. He says he's not... He's not terribly confident in the candor that's expressed to him. And this is that faking bad thing that I alluded to earlier. The thing is that he explains at the end that... Or at two points, actually, that he doesn't think that he's trying to mislead... That Baca's trying to mislead him. What he thinks is that Baca is so remorseful about how stupid it was that he did this thing that he is exaggerating his involvement in it. And that's a nice argument. And then the prosecutor, who also has the report, says, what about this line, he was giving me a line of BS and then would almost sit back and eye the effect on me of the information he had just provided. Well, you know, what's the relevance of the line? I mean, I'm not saying there's nothing that's quote, unquote, bad in this Howell's report. I'm saying that what there is can be easily explained by remorse, which is a very positive sort of element in a criminal defense case. And so the other thing they're talking about is that there's no evidence of organic brain dysfunction. But he didn't test for organic brain dysfunction. He never did EEGs or any of the stuff that would disclose that sort of thing. And then, you know... But it says here he did on 87. No, no, no. There were no indications of residual brain, residual organic damage based on the AISR, the Bender Gestalt... Right. Based on these screening tests. These screening tests don't look at the brain. These are tests where you check boxes and fill in forms. And then, you know, sometimes these things can screen in or screen out brain damage. But the way you test for brain damage is you do an EEG or a VEEG. You get a picture of the brain. You see if there's organic brain damage. And Dr. Benson wanted us to do that, but we couldn't do it because he's in prison  So it gets back to this idea that had we had an evidentiary hearing, we would have had an opportunity to present this kind of stuff. But we never had that opportunity. And, you know, I went into extensive detail about how many flaws there are in this – in the Court's – State Court's opinion that denies relief. I mean, he says ridiculous things like the tactics are unreviewable on habeas corpus. I mean, that's just totally wrong. There are cases holding that you have to find out what's the reasonable investigation that preceded that so-called tactical decision. And if there was no reasonable investigation that preceded it, then, yes, tactics are very much reviewable on habeas. He talks about it's inadmissible to have a doctor testify when you've got a calgic instruction that requires medical testimony. He doesn't cite any California Supreme Court cases. He's way out in left field as a Superior Court judge. He gets to do that. But here, we get to see whether there's any basis for his opinion, any reasonable basis, and there's not. And so – Kennedy, I'd better ask you to draw to an end, unless my colleagues have questions. You've gone through your time, but you'll get one minute for rebuttal anyway.  Thank you, counsel. Good afternoon, Your Honors. Deputy Attorney General Eric Christofferson on behalf – representing the rappellee Michael Knowles. We focused a lot on discussing whether trial counsel had a tactical basis and what his approach was in this case. What we have – what the record does show us is that trial counsel was counsel for the – for appellant during the preliminary hearing, which occurred on May 29th. On June 5th, seven days later, is when appellant was first interviewed by Dr. Howells. So counsel had, immediately after the preliminary hearing, started the process of getting appellant reviewed and analyzed by a mental health expert, because he recognized, based on the evidence in this case, that it did come down to one issue, and that issue was intent. And he really had two choices on dealing with that intent issue. One, even though he had some difficulties with California Penal Code Section 29, he could still present what's known as a diminished actuality defense, which focuses and says, because of a mental defect or a mental disorder, this person was not able, did not actually form the intent to kill. He also could choose to focus on the circumstances of the crime, focus on the evidence, and say, Mr. Baca, the appellant, wasn't out of his mind that night, but he didn't intend to kill anybody. And let's talk about where the – and focus the jury on that – on that argument. And he had – And he shot three times, and there was a statement, I got him, I got him, or something to that effect. Yes. You know, that's pretty strong evidence of intent to kill, and then that if the lawyer doesn't have any psychological defense, he's just trying to argue that those facts really don't mean much. Kellogg brought the gun with him. He didn't have to bring the gun with him. Exactly. I'm not saying that he didn't have an – that he had an easy case ahead of him. It was a very difficult situation. But ultimately, he decided to investigate both of those avenues. He investigated, he got a mental health expert, and that mental health expert, Dr. Howells, presented him with lots of potentially damaging information about the defendant. The report didn't come in until August, was it? August 28th. So he – in the course of – I – That's what prompted him, then, when he got that report, to move for the continuance? Correct. He got that report, and it was approximately a month later, three weeks later, at the – when he moved for continuance. He had already at the time, when he moved for continuance, had already contacted Dr. Siegel, the methamphetamine expert, and got the ball rolling and asked the judge to – for the continuance. Well, in the course of the in-camera hearing that went along with that, the judge said, I'm – this is – this is an affirmative defense that you're talking about. This is evidence that's going to come in after the prosecution's case in chief, after everything that we've gone.  And the trial didn't occur until – actually didn't occur, did get continued for other reasons, until October 21st. So it was actually almost a month later that the trial actually began, and he had indicated that he was going to get a – he could get a written report within 10 days   from Dr. Siegel. So he got – essentially got the continuance, in fact, that he was looking for. Yeah. But then what do you do with the fact that he didn't follow up during that period of time? Well, I think the – the record is unclear as to what he did at that point. All we know is that he doesn't have a formal written report from Dr. Siegel. Right. I mean, it seems to – it's an odd case, because it seems as though he made the tactical choice that he wanted to put on a mental health defense. He tries to put it on. He gets – he goes so far as to get an expert to say what he wants him to say, but then he doesn't follow up at the last minute, and there's no explanation for that. Why is that a tactical choice? Well, it's unclear what expert told him what he wanted to say, whether – certainly it wasn't Dr. Howells. No. No. But he's – he tries to get Siegel, who eventually comes into the case. Well, but we don't – yes, he got – he gets Siegel at some – at some basis. What we don't know is what Dr. Siegel told counsel, if anything. We know that Dr. Siegel didn't prepare a formal written report, and it could very well have been because trial counsel called him up and said, you got to give me any preliminary ideas about what's going on here. Dr. Siegel says, this doesn't look like a good case for methamphetamine psychosis. But we can't presume that one way or the other, right? The record is just barren on that. Well, yeah, the record is barren on that, and so what we know from the record that counsel talked to Dr. Siegel on the telephone after Dr. Siegel saw the defendant? No. Well, Dr. Siegel, I don't – never saw the defendant. He just reviewed the reports and the – and the videotape. Okay. Do we know that Dr. Siegel talked to defense counsel after reviewing the reports and the videotape? There's no indication that he did. There must have been – I assume there's some sort of conversation. We don't know if it was just called him up and said, I've changed my mind, or – But all we know from the record is that this attorney wanted to pursue the defense. He comes in with a late continuance motion. The judge says, well, try to work it in. You've got a few days, and then nothing happens, right? Correct. So on the face of the record, I know one can presume or put a spin on it. You have one spin. The other side has a different spin. But it's not a case where it looks as though the attorney made a conscious choice to say, no, I'm going to reject the mental health defense. I'm going to pursue my other – he simply wanted to, and he couldn't, right? Well, we know that he wanted to investigate a mental health defense, and in his motion for continuance, he said, I got a mental health expert, and I got Dr. Howell. He pointed me in the direction of – he's recognized that he didn't have the expertise in methamphetamine, pointing me in the direction of Dr. Siegel. And I felt that since my – one expert had told me that I needed to send him, I should go ahead and contact this individual. So whether he went from the start that I have to present a mental health defense or that he was saying I need to investigate a mental health defense, he – because, again, this case was very focused on the specific issues that went on the issue of intent. But what we really do know is that the investigation was never completed prior to the time the jury got the case. No, we don't. I mean, we don't have anything that says it was. We have an evidentiary void. Yes. And the question is, is why do we have an evidentiary void? An appellant, when in the letter from trial counsel to current counsel, indicated I didn't get a formal report. No indication of I didn't get any information. That question was never asked, apparently, even though counsel – current counsel and appellant throughout the years might have had access or could have asked trial counsel that question. It also – he also directed him to Dr. Siegel himself. And there's no indication about whether Dr. Siegel has now come in and said, oh, yeah, I was told this or that. So you've got this potential evidence that was clearly sitting there, available to – for current counsel or appellant to follow up on, and he didn't. Instead, he's leaving this evidentiary void and trying to argue the best spin on it for himself. And – Well, I guess what I was writing was something different. And this – how do we know this was a – there's nothing in the record that indicates this was a tactical choice? Affirmatively. And that is what the State court found. And I don't see anything in the record that really supports that factual finding. Well, other than the fact that trial counsel was very concerned about this being a double-edged sword, very concerned and expressly indicated, I don't want to present this evidence unless it's going to benefit my client. Yes. And so – But that doesn't say he made the choice not to. He was asking, in fact, for leave to present the evidence, right? I'm not quarreling with you, but it just – it seems to me that it's an odd record on this point, and that's a pivotal point in the case. Was it a tactical decision or not? Or was it just a decision that was made because the time ran out on him? He couldn't investigate. And then we have to say whose fault was that? I mean, that's – those are – those are the issues that build in there. But when the State trial court says, this was a tactical decision, I just don't see anything except perhaps circumstantial evidence or tea leaves from which you can draw that conclusion. Well, I think all the evidence in the record indicates that trial counsel was – it's just – I guess, as you said, maybe tea leaves, it's a matter of interpretation. Trial counsel throughout this entire time has been tacked – focused. He got investigation. He recognized that he had some problems with Dr. Howell's report. He recognized that he was – had an obligation to further investigate. He tried to do that. He recognized that this area of investigation was likely and would – had potential problems, but he wanted to look into it anyway. He worked out a situation with the trial judge to – may I finish my thought? Please. He worked out a – an agreement with the trial judge, and it seemed to be an agreement with that he would have sufficient time, and then ultimately didn't present that information.  I'm not saying you did a terrible job. I'm saying that under Strickland and – and the United States Supreme Court and Kimmelman – Kimmelman v. Morrison said there's a strong presumption that trial counsel acts with tactical basis, and the evidence of that – Where's the double-edged sword comment in the excerpts? Do you remember? The double-edged sword actually is not in the excerpts, and I apologize that I didn't catch that. I apologize that I didn't catch that earlier. It's – it's actually in the – No, that was my whole question. Okay. I apologize. Thank you, counsel. Thank you, Your Honors. Counsel? I ask you to look at two points in the excerpts of the record. First of all, at – at 92 of the excerpts, we have included the motion for continuance, which shows a date of September 18th with a trial date on the – on the face of it of September 22nd, four days before trial. And the reason for the continuance is that a continuance is required to obtain the advice of certain expert consultants in this case. I also point you to page 71, which is the letter from trial counsel, where I asked him if he had anything at all on Dr. Siegel. Was that 71, did he say? Yes, Your Honor, 71. And he says, you know, he didn't prepare a report, and he doesn't have anything at all. There are no documents responsive to your request, no correspondence, you know, no nothing. And one final thing I'd mention is that even as badly as trial counsel did, this jury was very – It doesn't really say quite all that. It says Dr. Siegel did not prepare a report. Now, I used to tell my experts, don't prepare one until we talk on the phone and I decide if I want one. Well, he also says, I believe that these documents are responsive to your request. That's all he's got. He's got – he's got – I don't know if that's all he's got. Well, that's all he – that's all he had to provide. I asked him for correspondence or whatever. There's nothing from Dr. Siegel in this record. Not a letter, not anything. But I guess if he had – That I want to make. He had an evidentiary hearing. If he had an evidentiary hearing on this, all of this would be fleshed out. Of course. It might fall against you. It might fall on your – Exactly. That's all we want is the chance. Did he ask for one in the State superior court? Yes, sir, all the way through, at every level of the State superior court of appeals, Supreme Court. We never got a hearing. He did ask for one in the State superior court. He did ask for one at every level. And is it right that the decision that we are obligated under 2254d to defer to on this is the thing at excerpts page 33 and 34? Precisely. And just the final comment I was trying to make is that, you know, even without any of this stuff, he already was out four days. I mean, this was a closed case, and what we're saying is that if – this would have been enough to push it over the top. Thank you very much. Thank you, counsel. Thank you. Baca versus Knowles is submitted.
judges: Thompson, Kleinfeld, Thomas